## Reading *v.* Gazzam, Appellant.

*Husband and wife—Alienation of husband's affections—Loss of consortium—Action.*

A wife is entitled, as a matter of right, not only to the support and maintenance of her husband, but also to his love and affection. It follows that if any woman by the exercise of any arts or wiles, alienates the husband's affections from his wife, entices him away from her presence, so that she has not the consolation and advantage of his society, and does not receive adequate support from him, an action may be maintained for such an injury. To entice away or corrupt the mind of one's consort is a civil wrong for which the offender is liable to the injured wife. The gist of the action is not the loss of assistance, but the loss of consortium of the husband, under which term are usually included the person's affection, society and aid.

In an action by a wife against another woman to recover damages for the alienation of her husband's affections, the case is properly submitted to the jury where the evidence tends to show that the defendant and plaintiff's husband were distant cousins, that the defendant wrote to the husband numerous letters addressed to him as cousin and signed by her first name, containing many expressions of affection, with regrets at his absence and desires for his presence, that at one time he was seen with his arm around her, that at a resort they strolled alone at night through a dark lawn until late hours, that after the husband began to spend his time with the defendant his love and affection for his wife waned, and that finally he abandoned his family and wife, and refused to support them.

MITCHELL, FELL and POTTER, JJ., dissent.

Argued Jan. 15, 1901. Re-argued May 8, 1901. Appeal, No. 214, Jan. T., 1900, by defendant, from judgment of C. P. No. 3, Phila. Co., March T., 1898, No. 1456, on verdict for plaintiff in case of Elizabeth G. Reading v. Anna Reading Gazzam. Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Affirmed.

Trespass to recover damages for the alienation of a husband's affections. Before McCarthy, J.

Plaintiff's statement of claim was as follows:

Anna Reading Gazzam, the defendant above named, has been summoned to answer Elizabeth G. Reading, the plaintiff, in a plea of trespass, in which the plaintiff claims from the defendant the sum of $100,000, the ground of which complaint is as follows:

Whereas, the said plaintiff is a good, true, faithful and honest woman, of good name, fame, credit and esteem amongst all her neighbors and others to whom she is known the whole of her life. That she was married January 30, 1872, to R. Charlton Reading. That there was born of the union Adda Sproul Reading, May 10, 1874 ; R. Charlton Reading, third, born August 13, 1878; and Elizabeth Grier Reading, born April 12, 1881, said three children being still living. That the father, R. Charlton Reading, was born June 8, 1845, and until about the year 1890 lived with his family and continued to their support. That about that time, or shortly thereafter, he became associated with the said defendant, Anna Reading Gazzam, and began neglecting his family, and that the said Anna Reading Gazzam, the defendant, is a single woman. She, the said Anna Reading Gazzam, persuaded him, the said R. Charlton Reading, to stay at various hotels throughout the country with her, commencing in the year 1892. In August, 1893, he visited the White Mountains with the said defendant for a month, and they visited various other places during that year in company with each other. In the latter part of the year 1893, the defendant, Anna Reading Gazzam, sailed for Europe, and upon her return in 1894, was met at the dock in New York by the said R. Charlton Reading, who brought her to Williamsport, Pa., the home of the plaintiff, and stayed there at a hotel for ten days. Before coming to Williamsport the said R. Charlton Reading spent about two weeks with her, the said Anna Reading Gazzam, in the city of New York, after which she came to Williamsport, stopping at a hotel, where the said R. Charlton Reading took his meals with her, had her rooms decorated with flowers, and, at least in one instance, was seen in such a position with her as to warrant the conclusion that improper relations existed between the said R. Charlton Reading and the said defendant, Anna Reading Gazzam.

During the entire year 1895 he was with her almost continuously, neglecting his family, and in June, 1895, spent five days in the house of the defendant at Philadelphia. In July, 1895, they went to Spring Lake, N. J., and attended the governor's ball in company with each other at Sea Girt, and on July 29, 1895, left for Hot Springs, N. C. On September 3, 1895, they returned to Washington, D. C., and on November 5 left

for Alexandria Bay, N. Y. On September 13, 1895, left for Montreal, Canada, returning October 16.

They were in constant correspondence by letter when he was not present with her. A sample of the correspondence is quoted in a letter from the defendant to the said R. Charlton Reading, reading as follows: .

" How much I would like to have you here just now to comfort me, but the conventionalities which you justly recognized when here, I foresee must deprive me largely of even my cousin. Yet they cannot altogether—in fact I find myself looking to see you soon again. And now good-night. A thousand times good-night, to coax away the solitude.

                              " Affectionately

                                   " Your Cousin,

                                        " ANNA."

In the summer of 1896, the said defendant spent in company with the said R. Charlton Reading, the husband of the plaintiff, several weeks at Lake Minnawaska or Lake Mohunk.

On January 12, 1899, the said R. Charlton Reading gave notice by letter to his family that he would no longer support them, and that they would have to take care of themselves.

And the said defendant by her acts aforesaid and by sundry other acts not herein specifically set forth, contrived and wickedly intended to deprive the said plaintiff of the society and affection of her said husband, and also to withdraw from her the support to which she is entitled from her said husband, to hurt her good name, and bring upon herself and her family great scandal and infamy by thoroughly alienating the affections of the plaintiff's husband, depriving her of that support and affection to which she is justly entitled. By reason of which premises the said plaintiff is not only deprived of the comfort and society of her said husband and much hurt and injured in her estate, but is also drawn into such great shame, scandal, and infamy, and remains so much disturbed and disquieted in mind, that she has suffered great and irreparable damage. Thereupon she brings this suit.

In addition to the letters quoted in the opinion of the Supreme Court, and the facts therein stated it appeared that the defendant was the divorced wife of Joseph M. Gazzam, that

her maiden name was Reading, and that plaintiff's husband who bore the same family name was a distant cousin.

The court charged in part as follows:

Gentlemen, I will call your attention to some of the testimony that has been offered on behalf of the plaintiff in this case.

In the first place, certain witnesses, Mr. Stephen McCandless and Mr. William Emory, were called in order to show the social position that the plaintiff occupied in the city of Williamsport. Mr. McCandless said that he resides in Pittsburg; that he is a son of the late Judge McCandless, of the United States district court; that he is a member of the Allegheny county bar, and was clerk of the United States district court for many years. He knew Mrs. Reading before she was married and has known her since. He knew her family, knew her father and her mother. Her father was the clerk of the United States circuit court for the western district of Pennsylvania, and her mother was sister of Judge Robert C. Grier, a judge of the supreme court of the United States. Her family held a good social position in Pittsburg, and removed to Williamsport about 1867.

Mr. Emory, who lives in Williamsport, said that he was acquainted with Mrs. Reading; that he has known her twenty-eight or thirty years; and that he knew her before her marriage. He said that he also knows R. Charlton Reading. He has known the family ever since. they have lived in Williamsport, and he said that the social position of Mrs. Reading in the city of Williamsport is very good, and unexceptional in its character.

Certain witnesses were called by the plaintiff to show the estate possessed by the defendant. Mr. H. Gordon McCouch, who is the secretary of the Fidelity Insurance, Trust and Safe Deposit Company of this city, said that the company is the administrator de bonis non cum testamento annexo of the will of John G. Reading, the father of Mrs. Gazzam, and that the company holds securities amounting in the aggregate to about $75,000. He said that Mrs. Gazzam has only a life estate in this property, and no power to will it.

Mr. William S. Wallace said that he kept the accounts of the

estate of John G. Reading. In June or July, 1892, the execu-
tor of the will of Mr. Reading turned over to the Pennsylvania
Company for Insurances on Lives and Granting Annuities, of
this city, and the Philadelphia Trust, Safe Deposit and Insur-
ance Company, of this city, in cash and securities, $750,000;
$375,000 in each trust, one half in cash and one half in securi-
ties. The income of this sum of $750,000, under the will of
her father, is paid to Mrs. Gazzam for life.

Mr. Nelson C. Denney, who was employed in the trust de-
partment of the Philadelphia Trust, Safe Deposit and Insurance
Company, said that that company is a trustee for Mrs. Gazzam
under the will of her father, John G. Reading; that her net
yearly income from that particular trust is about $18,000, but
that sum does not include the income that may be received by
that company from the Fidelity Company.

It was admitted by counsel for the defendant that the in-
come from the Pennsylvania Company, as trustee under the
will, amounts to about the same as that which is paid to Mrs.
Gazzam by the Philadelphia Company, so that I think it will
be proper for you to assume that her income is from $36,000
to $40,000 a year.

Mrs. Gazzam, who was called by the plaintiff as for cross-
examination, said that she has a home in Cornwall; that it
did not cost $100,000; that it was to have cost $50,000; that
she never had the time or strength to look into the bills.

So much for the social position of the plaintiff, and so much
for the estate belonging to the defendant.

I will next call your attention to the testimony of the two
daughters of the plaintiff, because it may have a very impor-
tant bearing on this controversy.

Miss Adda Sproul Reading, who is a daughter of the plain-
tiff and of Robert Charlton Reading, and who lives in Williams-
port, was twenty-six years old on the 10th of the present May.
She has one brother and one sister. The brother is Robert
Charlton Reading, who was twenty-one on the 13th day of last
August, and her sister, Elizabeth G. Reading, whom you have
seen, was nineteen on the 12th day of last April. Her father
will be fifty-five years of age on the 8th day of June. He was
married on June 30, 1872. In 1891 he commenced to go back
and forth to Philadelphia, and told them at times that he was

at Mrs. Gazzam's; that he had gone to see her about her divorce. He went back and forth. That continued in 1892 and 1893. In 1895 he left home and was away three months; then came home and stayed three days, and went away again for ten days. From that time he was gone at different times, sometimes two days and sometimes a week, and oftener much longer. In 1898 he came home just before Christmas, and on January 1, 1899, he left home and the witness has never seen him since. She was asked what sort of a feeling existed between her father and her mother prior to the time he began absenting himself, and she said it was "just as pleasant as could be." She said that her father remained away different lengths of time; sometimes two or three days, and sometimes for longer periods. His manner towards her mother grew worse and worse, more and more discourteous, until finally, at the table he would not speak to her; he would not offer her anything; he would put what there was in front of him to serve on a plate and push it in her direction, but never speak to her. She began to keep account in 1897. Sometimes she put it down and sometimes her mother put it down, but in 1897 the witness put down every time her father left and every time he came home. She said that he went away on May 18, 1897, and came home on July 16; went away on July 19 again and came home on October 12; went away on the 18th again and came home on December 28; went away on January 14, 1898, and came home on January 17; left on June 22 and came home on July 11; left on August 16 and came home on the 31st; left on September 24 and was away until December 23; left on January 1, 1899, and she has never seen him since. She was asked whether Mrs. Gazzam paid a visit to Williamsport in 1894, to which she replied yes; she stopped at the Updegraf Hotel and was there at least a week. Mr. Reading, her father, was in Williamsport at the same time. In relation to the question of money contributed to support the family, she said there was not sufficient contributed by her father; that her mother had some money of her own which she has since spent in keeping the family up. She said that her mother used all she had, every dollar. She said that her brother is now at Princeton College. Prior to 1891 or 1892 her father supported the family comfortably, and that it was about 1895 that the support began to fall

off so badly. From 1895 a bill never came in that he paid, or any money that he sent, that was not most grudgingly given. He wrote no letters to her mother. Very often he would send with the bills a letter to the witness, but sometimes it would have no beginning and sometimes he would say, "Adda, enclosed find so much, R. C. Reading." Sometimes there was no signature; sometimes there was only a blank sheet of paper with the check. These remittances were sent from Cornwall-on-the-Hudson, and some from New York. She could not tell the exact date that her father was made president of the Williamsport Gas Company, but he was president of that company about seven years. She did not know what his salary was. He supported his family from what he got out of that situation, with some assistance from her mother. She was told that his salary was $2,700 a year. In 1894 she visited Mrs. Gazzam at the hotel in Williamsport, having gone down at her father's request. She only called on her once. As to Mrs. Gazzam's relationship, she said she is a fifth cousin once removed, which makes it, she thought, a tenth cousin. Her father ceased to visit his family in Williamsport on January 1, 1899, which was the last time she ever saw him. She could not tell where he has been since January 1, 1899, up to the present time. On January 1, 1899, he left bills that were not paid, and after July 1, 1898, he failed to support his family. He has not written to her except one letter, in the beginning of the year 1899, in which he said he would have nothing more to do with them and would give them nothing more to support them.

On redirect examination she said that her father gave a notice by letter in January, 1899, that he would make no further contributions, and that he left a considerable amount of bills unpaid. He left a bill for himself, a trifling doctor's bill. She did not know how long it had been standing, but he left it for them to pay. It was not even with their physician.

Elizabeth Grier Reading, the younger daughter, said that she was nineteen years old on the 12th of last April, and she recollected the visit of Mrs. Gazzam to Williamsport in November, 1894; that she stopped at the Updegraf Hotel, which is one of the principal hotels in the city; that her father was in Williamsport at that time, and occasionally stopped a few minutes at the Reading home. She did not know where he went,

but she was in the room at the hotel once, and saw him there in Mrs. Gazzam's room. She said: "I was in one room that looked like her bedroom. And there was another room that was a sort of a sitting room. They were private rooms. I went in unexpectedly and did not announce my coming, and there was Mr. Reading and Mrs. Gazzam. They were sitting on a very small lounge, and he had his arm around her, and she was leaning on him."

On cross-examination she was asked whether she saw Mrs. Gazzam after that, and she said she saw her once, at the hotel. She was asked whether she visited her after that; whether after she saw this thing she went to the hotel and visited her, and she said: "I didn't think anything of it. I visited her little girl. Q. You did not think anything of it? A. No; I was only thirteen then, and I did not know any better. Q. Did you tell your mother what you saw? A. I did afterwards. Q. How long after? A. I really don't remember. Q. You can tell us whether it was years or months. A. It was months, or probably days. Q. So it made so little impression on you that you did not even tell your mother, although you were a young woman of thirteen years old? A. No, sir; it did not. Q. What you saw then, that you have now detailed, made so little impression that you did not even think of repeating it for months? A. It made a great impression, for I remember it distinctly. Q. But it did not make enough impression on you as being anything noticeable for you to mention it to your mother? A. I did it a few days afterwards. Q. I thought you said months? A. I said months, or probably days, I do not suppose it was more than three days, perhaps. Q. How many days after you saw it was it that you went to the hotel and visited Mrs. Gazzam? A. The next day. My father requested me to go there to see her. Q. Won't you tell us whether you think it was three days, or whether you think it was months? A. I said three days. Q. You are sure it was days, now? A. I am positive of it."

That incident, gentlemen, may be a very important one for you to consider in arriving at your conclusion in this case. I will here call your attention to the fact that Mrs. Gazzam, the defendant, emphatically denied that any such scene ever took place. You cannot believe both of these stories, and it is for

you to say which one of those witnesses is telling the truth in regard to that particular incident.

Mr. Elmer, who kept the hotel at Cornwall-on-the-Hudson, was called. He has kept an hotel there for about twenty-eight years, and knew Mrs. Gazzam and knew Robert Charlton Reading. He became acquainted with them first in 1895, when they came to Cornwall for accommodations as guests. He did not remember how long they stayed there in that year, but they stayed some time. They next came on June 22, 1896, then went away and came back in October. They stayed there the first time that year probably a month or so. They rented their rooms by the week. They next came in 1897, April 17, and left on December 4. He said then that it was Mrs. Gazzam that he referred to as leaving on December 4. He did not know exactly the length of time Mr. Reading was there during that time, but he was there most of the time. They did not come back the next year. The party was composed of Mrs. Gazzam, her daughter, Mr. Reading being there the greater part of the time, and a gentleman who was a tutor. Once they had a young lady for a governess, when they first came. The daughter of Mrs. Gazzam was a small girl. When they first came they had five rooms. Mr. Reading's room was across the hall, across a narrow hall. He had a room right over their room on the second visit. Under the rules of the hotel the house was kept open until the greater number of the guests had retired, as a general thing about 11 o'clock, sometimes a little later than that. Then the house was closed up and he attended to that matter in person. The daughter of Mrs. Gazzam, and Mrs. Gazzam herself, used to call Mr. Reading Cousin Charlie. They seemed to be together just the same as if they were always acquainted, and always had been together. They used to be out quite late at night, sometimes 12 or 1 o'clock, generally alone, as far as he knew. He would not like to say definitely just how late they had been out, but he could remember as much as after 1 o'clock, but he would not like to say any later than that. In pleasant weather that occurred almost every night, that they were out sitting on the piazza. The witness said that he used to see to the house himself, the last one, and he remembered one night that he did not know they were out and he locked the door, and that seemed to annoy

Mr. Reading very much, so he thought he took the key after that, but he told him he would leave it open for him if he wished. After that they could come in when they pleased without disturbing him. He was asked whether he ever saw Mr. Reading in the bedroom of Mrs. Gazzam, or coming out of it, and he said he was often there. During the daytime he had often seen him in her bedroom, and in the evenings he would go in and out, of course. Mrs. Gazzam's daughter had the room next to her. Mrs. Gazzam occupied the room alone. He saw Reading and Mrs. Gazzam drive out frequently together for long drives. They used to drive sometimes in the evenings. Mrs. Gazzam was building a house at Cornwall. The witness said that his house was a first-class, highly respectable hotel and that he had maintained that reputation for a good many years, as his guests have all been selected since he built the house, and he takes care that nothing improper should be going on in his house. Mrs. Gazzam's bedroom and her daughter's bedroom were connected together. The maid's room and the daughter's room, and the governess's room and Mrs. Gazzam's room were all connected together on one side of the hall. He was asked whether the bedroom that Mrs. Gazzam occupied was not also a sort of sitting room in which Mrs. Gazzam had her desk, and did whatever business she had to attend to, and he said, yes, that he saw not only Mr. Reading, but other people who had business with her and called upon her, go in and out of that room, and that that applied to all the different visits she made to his house. He said that Mrs. Gazzam registered in her own name, and that she commenced to build her residence in 1897. It was rather a large house, and they were a great many months building it. Mrs. Gazzam used to attend to most of the business in connection with the builders and the workmen that were there, when they came to the house. He did not know what Reading was doing, but he was supposed to be looking after it. After the house was finished Mrs. Gazzam occupied it as her residence, as far as he knew. He never saw Reading there during the year 1899, that he remembered, nor did he ever see Reading there during 1900. The last time he remembered to have seen Reading was about the time that the house was completed, or just after that.

Then came the testimony of the two detectives, who were

called for the plaintiff, one of whom was Louis A. Newcombe, who keeps a detective agency. In 1897, before going up to Cornwall, he sent his assistant, Mr. Ward, there. Mr. Ward was at that time an operator, but he is now Mr. Newcombe's manager. It was about the 1st or 2d of September, when the witness arrived at Cornwall and he stayed there a week. He and Mr. Ward occupied rooms directly across the hall, in what Mr. Elmer calls his old house, from the room occupied by Mrs. Gazzam. From this room it was easy to observe anything that transpired in Mrs. Gazzam's room, that is, such as going in and coming out of any of the occupants. Mrs. Gazzam occupied the front room, the young miss occupied the room leading out of Mrs. Gazzam's room in the rear, the man Reading occupied a room somewhere in the top of the house, and just where the maid had her room he did not know. He said:

" We could see from our room, and from being out on the porch in the evening or any time during the day, Mrs. Gazzam and Mr. Reading together. For instance, Mr. Reading, perhaps, would go off in the morning somewhere, and come back and be with her on the veranda or perhaps in the yard. They would be talking together. Then they would go to ride in the afternoon. In the evening he was invariably up in her room, sometimes with the door open, sometimes with the door closed. You could see sometimes from the veranda or piazza before the shades were pulled down, and then, after the shades were pulled down, of course you could not see anything. The maid would come to her room sometimes when Mr. Reading was in there; at other times she would not come. On one occasion, I think it was perhaps the 3d or 4th of September, we noticed that Mr. Reading was acting rather queerly, or as if he was ill. He came and sat down in her room in a chair, and from our room we could observe very plainly that she was pouring something from a bottle on his head, or rather shampooing it, so I took it for granted that he had a headache or something of that kind. Later in the evening he would go off; then the maid would come back in the room and the room would be closed up, the light put out, and then perhaps as late as 1 o'clock the maid would very quietly leave Mrs. Gazzam's room and proceed to her quarters, wherever they were. I think she would lock the door from the outside, but I am not quite positive on that point. In

the morning Mrs. Gazzam's maid would come there and enter
the room, and we could not, of course, see anything then.   We
were there two Sundays.   We got there on a Saturday night,
and we were there one Sunday—yes, we were there two Sundays,
and left, I think, the next Tuesday.   We were there about ten
days.   Mr. Reading would be in and out of the room.   I re-
member one night going by the windows and glancing in, and I
saw them examining a large book which was on a pedestal or a
table, or something of that kind, and they were in conversation.
Then, at other times, they would sit there, she in one chair and
and he in another, and one night she was out on the piazza, and
he went and sat at the extreme end of the piazza, where he was
listening to the music.   She didn't go out that way that night.
There seemed to be a little difficulty between them.   I saw her
crying, and her appearance was not what it ought to be.   She
had on an old filthy wrapper, and her hair was all amuss.   In
the daytime they would be out riding.   Mrs. Gazzam would be
in her room or out on the porch.   Mr. Reading was away some
of the time.   In the winter of 1897, after Mrs. Gazzam obtained
rooms at the Fifth Avenue hotel, I saw Mr. Reading enter the
hotel, and also saw him, from diagonally across, from the hotel
on the other corner, sitting at the window of her room, which
was on the top floor on the northeast corner of the Fifth Avenue
hotel."

The witness could not tell whether that was her bedroom as
he had never been in it.   He saw Mr. Reading there late in the
evening, as late as ten o'clock, in her room.   He could see
Mrs. Gazzam and Mr. Reading.   Mrs. Gazzam's child was a
young miss of fourteen, he thought.   The maid was colored.
He had seen Mrs. Gazzam drinking out of a bottle on several
occasions at Cornwall and on one occasion in New York on the
street, on the corner of Twenty-third street and Broadway.   He
said that Mr. Reading had a bottle in his pocket on the occasion
in New York, and that he reached around this way and handed
it to her, and she took a drink out of it.   That was the night
they went to the Lyceum theatre.   He saw that once in New
York and several times at Cornwall.   Mr. Reading carried the
bottle in New York.   He never saw her take a drink at Corn-
wall except in her room.   He was asked: "Did you see him

drinking in her room?   A. No, sir; I don't think I ever did. I am positive I never saw him take a drink in that room."

As to the hotel register at the Fifth Avenue hotel the witness said that Mrs. Gazzam was registered there, and her daughter, Miss Gazzam.   He did not think the maid was registered, but thought it said, "and maid."   He said that Reading was not staying at the hotel at that time, but that "that was singular to us, for the reason that he was not registered there, and still we would take him into the hotel, and not see him come out on several occasions.   They were there for a month or more.   I have not the exact date."

The daughter's room at the Fifth Avenue hotel, the witness said, was in the rear of the mother's, and directly opening into and communicating with her mother's room.   The daughter was a young girl at least fourteen years of age.   He saw Reading there quite late at night, 10 o'clock, or after 10, perhaps. He saw the hotel maid go in and out, and also saw men in the room whom he did not know, but supposed they were there about the contracts for the house, as they looked to him like salesmen.   The witness occupied the same room at Cornwall afterwards that Mrs. Gazzam had occupied, and he said that it was an old-fashioned house and the room was perhaps twenty feet square with a fire place and two windows front and one window on a little angle which led on to the side piazza.   The door leading to the room occupied by the miss would be directly in the rear of the room.   He could not tell what Reading was doing at Cornwall, whether he was superintending the building of Mrs. Gazzam's house or not.   He never saw the door between the daughter's room and Mrs. Gazzam's room locked, but he saw it closed and never open of an evening.

Mr. Elmer was recalled and was asked who paid Reading's bills at Cornwall.   He said, "Until the last year, Mrs. Gazzam paid the bills.   The last season he was there Reading said he preferred to pay them himself."

The other detective, Frank W. Ward, was then called.   He is a private detective connected with Newcombe's Detective Agency in New York, and was assigned to look after the movements of Mrs. Gazzam and Reading.   He went to Cornwall about August 17, 1897, and remained until August 28.   He noticed that Mr. Reading and Mrs. Gazzam were together a

great deal of the time. He noticed that they had their meals together, went driving together, sat in the room talking together, sat on the porch together, in fact, were nearly always together. He very seldom saw one without the other. He saw Reading in Mrs. Gazzam's room every night, and one night in particular he stayed in her room until the hotel closed, about a quarter of eleven. They used to ride together, usually in the afternoon, sometimes in the morning. He said, " I remember one evening, I suppose about half past nine, they had been sitting on the porch, and Mr. Reading got up and went inside and got a red shawl and threw it over his arm and they strolled out on the grounds in the rear of the house. It was a very dark night, and there was no moon, no stars or anything, a black night. This was out in the lawn back of the house. There was a large lawn. I suppose five hundred yards of ground in the rear of the house. I could not tell whether they sat on a bench or not, but there were benches there. They remained out there from 9:30 up to the time the hotel closed at 11 o'clock, when they were still out. I didn't see them come back."

The witness was asked whether he ever saw Reading give Mrs. Gazzam any special attention, and he said: " I remarked it on nearly every occasion I saw them together. Mr. Reading was in the habit of treating her in what you would call a mannerly way, I suppose. He would open the carriage door for her and help her in and help her out, and wait for her at breakfast, and push her chair in under her as she sat down, and pull it out probably as she left the table. He would get the rocking chairs for her when she would go out on the porch, and acted like a man that thought a good deal of the lady. I saw them on the evening that Mr. Newcombe referred to, when he said that she poured some substance on Mr. Reading's head and rubbed it and cared for him, that evening that he appeared to be ill. I saw them on the evening Mr. Newcombe referred to when the little difficulty appeared to have arisen between them, and Mr. Reading walked away and sat at the other end of the porch for probably an hour. Mrs. Gazzam sat by herself, with no one about her at all. I saw them in New York. I saw them come out of the Fifth Avenue hotel together and walk to the corner of Twenty-third street and then Mr. Reading took this bottle from his pocket and handed it to Mrs. Gazzam and

she took a drink and returned it, and they got on the car and rode to Fourth avenue, and entered the theatre together. That was all I saw of that incident."

He said that they went directly from the hotel to the theatre, but he could not say whether they went directly from the theatre home to the hotel or not. He was asked whether he saw any of the people who were working on the house at Cornwall come over to the hotel, and he said he never saw a soul come there. Referring to Mrs. Gazzam's room in the hotel, he was asked whether he did not see the appliances in it that would be in a place in which business was transacted, and he said not. " Q. Was there a desk there? A. I don't remember seeing any desk. Q. Weren't there business papers all over the room and tables? A. No; no business papers that I ever saw. Q. What is the latest hour you say you ever saw Mr. Reading coming out of Mrs. Gazzam's bedroom at Cornwall? A. I should say about half past ten."

The plaintiff called one other witness, to whose testimony I will direct your attention, James Greenleaf Sykes, who lives in New York and is in the decorating and furnishing business. He said that he had business relations with Mrs. Gazzam, had the contract for decorating and furnishing Mrs. Gazzam's new house at Cornwall-on-the-Hudson, and first met her in January, 1897, at the Fifth Avenue hotel, in her room there. He had an introduction to her, and his business was to obtain work and carry out work in decorating and furnishing people's houses. Subsequently he went to Cornwall. He did not go there for any length of time, but went there very many times, just up and back the same day. In some cases he stayed over night, or one or two nights in one or two cases. He knew both Mrs. Gazzam and Reading. He saw them sometimes once a week, and other times once in two or three weeks. He had supervision of the work under his contract. He had never seen Mrs. Gazzam until he was introduced to her at the Fifth Avenue hotel, and Mrs. Gazzam introduced him to Reading at Cornwall. He did not know whether Reading was married or not, but thought he was not. He had no idea that he was married, as Reading never spoke of his family. Reading was always very attentive, as any gentleman should be to an invalid, and as the witness always intended to be and always was him-

self. " His behavior was not any more attentive than my own was in Mrs. Gazzam's presence. I always had a thought for her, a care for her, for, aside from being a business friend, she is a personal friend, and I value her friendship. She was an invalid from the time I commenced to know her, and required constant attention from the people around her. Everyone had a thought for her."

The witness saw nothing whatever in the conduct of Mr· Reading towards Mrs. Gazzam other than what he would put to the score of what a man would do in the way of attention to a sick woman. He was always a gentleman, as any man naturally would be under the same circumstances. The house was about two years and a half in building. The last of the work done by the witness was finished in November and December a year ago, 1898. He said that Mr. Reading took a considerable part in superintending the building and looking after it as he was Mrs. Gazzam's manager. At the Fifth Avenue Hotel the witness was accustomed to go into Mrs. Gazzam's room. She had a desk and her own things about her there. He was asked, " You did not think there was any impropriety about it or you would not have done it ? " and he answered " Not the slightest. Q. When you saw Mrs. Gazzam you always saw her in that room ? A. I always saw her there. Q. Had she papers there in connection with the business? A. All about the room."

He was asked whether Mrs. Gazzam walked around every day, and he said that she did with great difficulty; that she had a very serious heart trouble.

I believe that I have directed your attention to all of the testimony on the part of the plaintiff except the letters. Your attention has been called to about nine letters, written by defendant to Charlton Reading, and it is important that I should say something to you about them, because the allegation has been made on behalf of the plaintiff that these letters demonstrate that Mr. Reading was the paramour of the defendant, and that they have a damning effect; on the other hand, the allegation on behalf of the defendant is that these letters were written by a poor, sickly, invalid woman, in a friendly and cousinly way, to one whom she had known from her childhood. It will be for you to consider these letters carefully in connection with

all the other testimony in the case, and to say what you find in them, whether you can find any support whatever for the allegations of the plaintiff, or whether you will find they were written in the way and manner in which the defendant's counsel say they were written, that is, by a woman who was sick, and by a woman who was always accustomed to use poetical allusions in writing.

You will remember that all of these letters were found at Williamsport, in the drawer of a bureau belonging to Mr. Reading, and that they were not locked up or concealed in any manner. I believe they were found there by his daughter. . . .

It now becomes my duty to call your attention to the testimony offered on behalf of the defendant. Before referring to the testimony of Mr. Pigott and Mrs. Gazzam, let me remind you that Miss Nina A. Page, from Wisconsin, was called, and said that she became intimate with Mrs. Gazzam in 1892, in September; she helped her to take care of her little daughter. She saw Charlton Reading while she was a member of Mrs. Gazzam's family, and saw Mrs. Reading and her son and younger daughter when they called. She said that the children came to play on one occasion with Mrs. Gazzam's daughter, and that Mrs. Reading was present at a luncheon given by Mrs. Gazzam, which was the first social function she gave after she was able to be up. In the summer of 1893, Miss Page went with Mrs. Gazzam to New York. They were there two or three days, and in Brooklyn for a little time, and from there went to Long Island, then to Nyack-on-the-Hudson, then to the White Mountains, stopping at Newport on the way. They went to the Maple Wood Hotel in the White Mountains. The party consisted of Mrs. Gazzam, her daughter, her maid, Mr. Reading, and Miss Page. Reading joined the party at Nyack, and took them to the mountains. He was with them for about three weeks. The conduct of Mr. Reading and Mrs. Gazzam was simply that of a friendly relation, such as any gentleman would give to a lady who was a member of the party. Mrs. Gazzam's health was bad during the preceding fall and winter. She was confined to her bed when the witness first went to her. At Christmas time she was able to go down to the parlor to superintend the final arrangements for the Christmas tree. Her health improved slowly, but she was essentially an invalid.

She was supposed to have nervous prostration. She was able to work a little with her mind when she was not bodily exhausted. She saw people in her room. One half of her bed was not disturbed, and she often kept her papers there. She worked late into the night. The friends who called always saw her in her room.

Mr. Melville B. Sherwood, who lives in Cornwall, and who is a gardener for Mrs. Gazzam, and has been since early in 1897, first saw Reading in 1896. The witness said that Reading was superintending Mrs. Gazzam's business in building the house in the early part of 1897, and he spent every day during the daytime in his duties, and that the house was a mile and a half from the Elmer House. Reading continued there until December 20, 1898, and has never been there since. During the winter of 1897 and the spring of 1898, Reading boarded across the road from the Elmer House, at a place called Vogt's. Mrs. Gazzam was not there during that time, but came about once a week to visit the place. She usually got there about noon, and went back in a train about 5 o'clock, generally accompanied by her daughter. The contractor did not finish his contract, and Mr. Reading superintended the finishing, that is to say, the interior of the house, work connected with the electric light plant, and, in fact, everything connected with the house, more or less, as well as the place outside. Mr. Reading was a practical man, and got along all right and finished the work up. There was trouble with the electric light plant. First the plant was too small and had to be enlarged. This was done under Mr. Reading's superintendence. The witness saw Mr. Reading from time to time with Mrs. Gazzam. Their conduct was perfectly straight, open, and above board in every way. He saw Mrs. Gazzam at the Elmer House once or twice, and when he went there he saw her in her bedroom. Her desk was in there.

John L. Couser, whose home is also at Cornwall-on-the Hudson, and who is a carpenter, testified that he knows both Mrs. Gazzam and Charlton Reading. He said that Reading went after him to do some work at Mrs. Gazzam's house on March 2, 1898. He procured a number of mechanics and took charge of them for Mr. Reading and under his supervision. He worked under him until he left, and Mr. Reading was there nearly the

whole time, almost every day. He said that Reading gave
orders in regard to anything that he wished altered or done.
The building had been completed by other contractors, but
their work was not satisfactory and Mrs. Gazzam had this work
done over. The witness started with three or four men and
had as high as fourteen until some time in May, when a ma-
jority of the men were gone. He kept on a few more under
Mr. Reading's direction. The majority of the men were through
in the latter part of June, when Mrs. Gazzam came there.

Charles H. Blood, a witness for the defendant, testified that
he lives in New York, and had been acquainted with Mrs.
Gazzam since the fall of 1895, when he went to the Fifth Avenue
hotel to take charge of her daughter. During that time the
architect was selected and they commenced to build the house.
" I became her secretary and finally superintendent for her un-
til Mr. Reading took charge. That was during the summer of
1896 that I was in charge, when there began to be difficulty
with the architect and contractors. I continued the superin-
tendency until Mr. Reading took charge on July 1, 1897.
When in Cornwall the witness lived at the Elmer House. Mrs.
Gazzam was there. Wherever Mrs. Gazzam went he went.
The party at the Elmer House consisted of Mrs. Gazzam, her
daughter, her maid, and the witness. Reading came to Corn-
wall about 1897. " There had been a power house, a brick
power house, which was not large enough, and I had been
studying the matter for a month and I could not see the solu-
tion of it, and Mr. Reading came on the ground and said, ' Yes;
I know how to settle that,' and Mrs. Gazzam seemed disposed
to have Mr. Reading take charge of it, which I was very glad
to have him do, and he took it off my shoulders. I left Corn-
wall on the afternoon of June 30, 1897, and have never been
in her employ since. I have been up to Cornwall a number of
times visiting her, and have been with her to different places,
assisting her, but never in her employ. I have visited her sev-
eral times a year, and saw Reading there up to the time he
left. Whenever I was there I saw him. When she was not
able to have the reception room at the Elmer House, she had to
take what was Mr. Elmer's dining room in the winter as her
bedroom. Her daughter's room led out of that room. The
door was never closed to my knowledge. When Mrs. Gazzam

had the apartment on the left, everything had to be done in her bedroom. I never have seen anything but what was perfectly proper between Mr. Reading and Mrs. Gazzam. I have seen them all day long and all the evening until 11 o'clock at night. I have always considered Mrs. Gazzam as an invalid and never free from pain. She was unable to go up a flight of even five steps without stopping. I cannot conceive of her going out with her daughter, maid, and possibly any one else without some one to look out for her baggage and other things."

Then came Dr. Barcus, a physician and graduate of the Jefferson Medical College, of this city, who lives here, and who was first called to see Mrs. Gazzam as her physician about eight years ago. She was then suffering with neurasthenia and palpitation of the heart. The doctor said that neurasthenia is a great pain around the heart; a nervous affection of the heart and muscles. He said that she was confined to her bed for several years, and he treated her until she was able to get out of bed, and then he treated her on and off until the present time. He accompanied her on the European trip in 1893 and 1894, and continued with the party a little over six months. He said that Mrs. Gazzam has orders from him, if at any time she has palpitation of the heart, whether she is on the street or in a theater or anywhere else, to take her medicine, which is a little brandy and water, half and half. She is suffering from palpitation of the heart, and when she has to climb a step, or when she talks too much, her heart begins to beat very fast and she becomes exhausted sometimes. She cannot take charge of a party in traveling, and she would not be able to go about baggage rooms, looking after her trunks and other things.

Mr. William H. Schofield, who lives in New York city, was then called. He said that Mrs. Gazzam is a cousin of his mother's—a cousin of his once removed. He sold her the tiling and fireplace work and mantels for her place at Cornwall, and met Charlton Reading there as Mrs. Gazzam's superintendent. He said that Reading had general superintendence of the work as it was progressing there, and he regularly called upon the witness at his office in New York with some message from Mrs. Gazzam or some instructions in regard to the contract. At the house Reading had general superintendence of the work, and would criticise any portion and request changes. The con-

duct and demeanor of Mr. Reading and Mrs. Gazzam towards each other was always that of a lady and gentleman. In August and September of 1899, the witness escorted Mrs. Gazzam and a party to Lake George and Lake Mohonk and returned to Cornwall. He went simply to attend to the work of traveling, as Mrs. Gazzam considered she was not able to attend to it herself, such as looking after the luggage, procuring tickets, and things of that sort.

Mrs. Mary Reading Sanford, a cousin of the defendant, was then called. She said that her father was Judge James M. Reading, of Illinois; that she visited Mrs. Gazzam in 1895, at 2126 Walnut street, in Philadelphia—visited her twice—and visited her in Cornwall last summer; that she met Charlton Reading there in 1895, as he was there looking after the suit, or the business in relation to the Fidelity Company. In relation to the conduct and demeanor of Mrs. Gazzam and Charlton Reading, she said it was just as a gentleman should act.

I will now direct your attention to the two letters that were produced by the plaintiff and offered in evidence by the defendant, from Mr. Reading to his wife and daughter, one written on January 9, 1899, and the other on January 12, 1899. On January 9, at 2:30 P. M., he wrote to his wife and said:

"My ability to pay being very limited, I cannot exhaust all my money paying debts contracted by you and the children. Considering my own condition of health and knowing I am liable in the near future to give out, I must provide for such an emergency. Unless you can see your way clear to pay these bills yourself, or are willing to see the merchants and others lose their money, you had better be very careful about having anything charged."

The letter to his daughter mentioned a number of bills which he had paid while he was in Williamsport, amounting to $502.73. That letter was written on January 12, 1899, in which he said:

"I am in New York trying to find something to do. As to being able to pay any more bills of any amount in Williamsport, I cannot see my way clear. There is bound to be an end of this bill business and somebody will have to go without their money. The end might as well come now as later. As to any mail that comes to the house addressed to me, you are at liberty to open or do as you wish with it. There is certainly nothing

that can interest me. As you all seem to be able to run things in your own way, I wish you success."

The letter is signed by R. C. Reading and is addressed to Miss Adda S. Reading.

Gentlemen, I believe that I have called your attention to all of the defendant's testimony that has any important bearing upon this case, except that of Mr. Pigott and Mrs. Gazzam. Mr. Pigott's testimony may have an important bearing in your opinion. He is a lawyer and a member of the Philadelphia bar, and was assistant secretary of the Fidelity Trust Company of this city from 1891 until 1894, and was secretary until 1898 when he resigned. He knew Mrs. Gazzam and he knew Charlton Reading. He became acquainted with Mrs. Gazzam in 1892, in the latter part of July. The Fidelity Company had been appointed administrator of the estate of John G. Reading, Mrs. Gazzam's father, and she sent a note to the Fidelity Company requesting that whoever was to be in charge of the estate should come to see her, as she was an invalid in bed. In consequence of that he went to see her, and from that time he has known her well. He became acquainted with Charlton Reading shortly afterwards, having seen him a few days after he first saw Mrs. Gazzam. Immediately after the appointment of the Fidelity Company as administrator, litigation was commenced by that company as administrator, and steps were taken to secure an accounting from Joseph M. Gazzam of his acts as attorney in fact under a letter of attorney given to him by the decedent, John G. Reading, and also an accounting under a certain contract which was made in the lifetime of the decedent with Gazzam. A bill in equity was filed. There were certain questions in that litigation which required evidence to support them, namely, as to the mental incompetency of Mr. Reading a short time before his death, and Mr. Charlton Reading was employed for the purpose of helping in getting the data on which to bring this suit. That was done under the advice of counsel. "For a period of probably two years, Mr. Reading was off and on in Philadelphia in connection with that business. He did a large amount of work, some of which was very important to the litigation. Whenever he had any information to give us he came down to see us. If we wanted him we sent for him. He was practically in the employ of the Reading estate. He was the

president of the Williamsport Gas Company, and we had no hesitancy in calling upon him for his services in that connection. He had to go over the books of the decedent, which were at Mrs. Gazzam's residence, and I recollect it took him quite awhile to do that, the books being in very poor shape, and there being a very considerable amount of information to be extracted from them. When I first met Mrs. Gazzam she was in bed, and I think for a period of about six months she was in bed. After that she was well enough to be out of bed, but she has never, to my knowledge, during my acquaintance with her, been other than an invalid. She transacted business perfectly with me at the time. It was only her physical condition, and that did not weaken her to such an extent that she could not talk with me more or less. There were occasions when, as I recollect it, the interviews were short on account of her weakness. These interviews took place at 2126 Walnut street. She was not in a condition to come to the Fidelity. They took place in her bedroom in the third story. The estate of John G. Reading held 9,000 out of 10,000 shares of the preferred stock of the Williamsport Gas Company. The Reading estate held the absolute control of that company, elected the directors and officers, and dictated its policy. The directors were Mr. Charlton Reading, Mr. John G. Reading, and some others. Charlton Reading's official connection with the Williamsport Gas Company began in the fall of 1892. There was a special meeting of the board held. Mr. Gazzam resigned, and Mr. Charlton Reading was elected as president in his place, at a salary at first of $2,500, and subsequently it was increased to $2,700. He was not engaged at that time in any other business, to my knowledge; not any actual business of any kind. He was elected at the request of Mrs. Gazzam. The question as to who should act as president of the Williamsport Gas Company came up very shortly after the inception of the Fidelity's duties in regard to the Reading estate. Mr. Joseph M. Gazzam had been the president, but by reason of his wife's divorce from him, and of his discharge as executor, it was not deemed wise that the Williamsport Gas Company should be managed by him. Mr. Gazzam acquiesced in that view and resigned. Mrs. Gazzam suggested to us a short time after we undertook the management of the estate that we should elect Mr. Charlton Reading

as president. I had inquiries made which satisfied me that he was a proper man to be elected, and we then elected him. Reports were made to me every month, and I kept a very close eye on the operations of the gas company until some time in the fall of 1898, when the Reading estate sold its stock to a purchasing syndicate, one of the conditions being that the purchasers should name new officers and that Mr. Reading should resign, which he did. During his presidency, from 1892 until the fall of 1898, certain absences were authorized."

Mr. Pigott testified that Mr. Reading consulted him on several occasions with reference to the propriety of his going away from Williamsport, and he was authorized by Mr. Pigott from time to time to leave Williamsport, in connection with Mrs. Gazzam's business. Mrs. Gazzam wanted him to accompany her to certain places, and Mr. Pigott authorized that it should be done. His going to certain places also applied to his going to Cornwall in connection with the building of the house. After the lot was bought, Mrs. Gazzam consulted Mr. Pigott two or three times with reference to the plans and the contract with the architect, and she also consulted with Mr. Charlton Reading on the same point. Mr. Pigott was present at two or three of these conferences, at the Fifth Avenue hotel, and also at the Elmer House at Cornwall, at which Mrs. Gazzam and Mr. Charlton Reading were present. Those conferences were held in her room, on the first floor at Cornwall, and on the top story at the Fifth Avenue hotel.

I have reserved the testimony of Mrs. Anna Reading Gazzam, until this moment, because I think it my duty to refer to it copiously. As I have already said to you, this is a very serious charge that you have to deal with, a tremendous charge, the alienation of a married man's affections, stealing him away from his home and family, and breaking up that home; and this defendant, who is charged with these grave offenses, is entitled to have your attention directed to everything that she has to offer by way of defense.

She testified that she is the daughter of the late John G. Reading, who died in 1891 ; that she has only one child, a daughter, Antoinette Elizabeth, whose age is now seventeen, and who lives with her at her home in Philadelphia, where she has always resided with her mother except when they have

been traveling ; that she has only one uncle who survived her father, and he resides in Maryland, not very far from Washington, and is an elderly man. According to her testimony, she thinks she is about a third cousin, as near as she knows, to Charlton Reading. Another cousin of the same connection told her so. She has known Charlton Reading all her life, although for years she saw nothing of him, but the families were very intimate. His elder sister was one of her mother's most intimate friends ; in fact, they were very much more intimate than some branches of first cousins brought up together as first cousins. She is the first cousin of John G. Reading, Jr., but the only time she has seen him since her father's death was when she sent for him as soon as she felt able, to give him one or two momentoes her father had left him. He had been in the habit of visiting there at times for a short time, but he never came to see her after her father's death except on this one occasion. He went to Mr. Gazzam instead of coming to her. At the time of her father's death she had no near male relative with whom she could consult. Her elderly uncle was far away and was unable to come. She applied for her divorce early in 1891, and the decree was held over until 1892. At that time she was confined to her bed, suffering from extreme heart exhaustion, and for two years had not been able to arise from her bed. She said that was the summer when her physician, Dr. Barcus, gave her treatment that began to get her out of bed. It was a very slow process. Afterwards her health gradually improved. When the name of Charlton Reading was brought up to her room, she had just been talking with her counsel in regard to the divorce matter, and was obliged to send her regret that she was unable to see him. He sent word that he would be in the city for a few days, and he called again in about two days. She said :

" He came up to me at that time and asked me what was this trouble that he heard of ? Was it true I was getting a divorce ? Mr. Reading asked me if this were true, if I was getting a divorce, and I said, yes. He seemed kindly interested and asked me what the trouble was, and I think I showed him a copy of the evidence. He asked me when the decree would be given, and I told him on the following day. He said, how strange that he should happen there just the day before the decree; he thought it fortunate, that some one should be there,

some friend of mine. He asked me if I had any relatives that would be there, and I said, no. I knew nothing about it, not that it made any difference at all. He said he thought it would be better, that there were many unjust things being said concerning me, and he would like to see this for himself and be able to speak by the boards for one of his own family and name. He asked if had any objection to his going there. I said certainly not. He went, and called upon me again, I think, in a day or two, and told me a friend of his had stated to him, that as Mr. Gazzam was to be asked to resign from the presidency of the gas company, perhaps he could obtain it. He told me he had nothing to do for three or four years; that in every way he was very unhappy; he was almost at the point of despair; he was just about leaving this part of the country if not the world; that his family were very unkind to him; that he had been ill for a year from a fall on the back of his head, and if I could give this to him by my influence with the trust company, it would help him very much. I did so. I used my influence with some little trouble, as Mr. Pigott has said. Finally, the situation was obtained. The tears rolled down Mr. Reading's cheek when he spoke of his cousin, my father, and he offered, with a great deal of gratitude, to do anything for me that a relative might do, seeing how much I was alone and I needed him. I did not expect to be able to use that offer so soon, but in a very short time afterward a question arose about the placing of the estate in a trust company, and Mr. Reading said to me when he left to return home, that he would come at any moment to my assistance. He said if I would send him a telegram which would reach him some time in the afternoon, he could take the midnight train from Williamsport, and he could be here in the morning, and I should not hesitate to call upon him at any time; therefore, after a few days I wired him to attend to a matter which had to be settled, I was told by my counsel, in three days. Mr. Reading took the midnight train, as I said, and attended to the matter, and was out among the trust companies all day for one or two days, and finally placed it in the Fidelity. After that he returned to Williamsport. Some time during the early part of the summer he had taken my little daughter and her governess to his sister's, Mrs. Remington, who lived near Williams-

port, in order that the child might remain in the country for the summer, and later he brought her back to me with the governess. I rather think that Mr. Reading was one of the first ones who told me that the equity suit was needed to be brought. I didn't know the necessity of it. He offered his assistance and gave it at all times, in regard to data concerning the suit. I think the first trip that I made at all was to New York in the early part of 1893, probably the spring of 1893. I went there with the assistance of another cousin, who met me and helped me in New York. Mr. Reading was not there. I remained in New York and went from there to the seashore, trusting to just ourselves (a lady was with me), but we did not get through very safely. Q. Do you recall where you went in the summer of 1893 with a party? A. We went from Nyack. We were just about leaving Nyack when I sent for Mr. Reading. We went from Nyack to Newport, I think that was the first stop, and we remained there for one day, and I think we went to Boston and remained a day there, and then we went to the White Mountains, to the Maplewood House. The party was composed of my friend, Miss Page, my daughter and maid. Miss Page was the daughter of one of my physicians, and was assisting me with Antoinette; she was teaching her a little. She and Antoinette and the maid and Mr. Reading were of the party. In the White Mountains we accidentally met the Richeys of Trenton, who were distant relatives; I think probably about as nearly connected as Charlton Reading. Mr. Augustus G. Richey was a lawyer, and was an intimate friend of my father's, and one of the executors named in my father's will, and he had been intimately associated with my father in business transactions. We stopped at the Maplewood House. We started about the 1st of August, and we must have been altogether on the trip, I imagine, about three weeks probably. I returned to New York a few days in advance of the 2d of September, because I was to sail on the 2d of September with my physician for Europe. The party to Europe was made up of Dr. Barcus, my physician, Miss Schofield, the daughter of my cousin, the Rev. J. H. Schofield, and my child, and we crossed without any maid. No one else joined the party, but my cousin was called home on account of illness and the doctor was also obliged to leave me. I was absent from the country

a little over a year.   I sailed for Europe on the 2d of September, and returned in the latter part of October or November. I went to the Murray Hill Hotel, in New York city, and from there to Philadelphia for a few days, and from there to Williamsport.   When I returned I had planned to visit two of my eldest family relatives, my aunt, in Illinois, the wife of Judge Reading there, the widow of my father's brother, Judge Reading, of Illinois, and this cousin I have alluded to before, Mrs. Remington, near Williamsport.   I was very, very much overcome and prostrated by the journey home from the effects of the sea voyage.   I was met in New York by Mr. and Mrs. Watson, of Philadelphia, also some of my cousins, the Schofields, and Mr. Charlton Reading.   I had not apprised him of my return or of the vessel I would take, but he had learned it through the trust company, and said he was afraid no one would be there to help me through the custom house, etc., and see after my luggage or meet me.   I remained in New York a week or two longer, trying, as soon as I was able, to look at lots in that vicinity."

She then paid a visit to Williamsport shortly after her return from Europe, and she was told by her counsel that it had been testified to by Elizabeth Reading that on a certain occasion she went to an hotel where the witness was staying, and entering the room saw the witness and her father sitting on a sofa, and that his arm was around her; and she was asked to state whether or not such a thing occurred, and she said it had not. After she left Williamsport she returned to Philadelphia, and remained there throughout the winter until it was time to leave the next summer.   In the summer of 1895 she went to Spring Lake, where she remained three or four weeks during the month of July.   The party there was composed of her daughter, a young friend of hers, her maid, and herself.   The young friend was Miss Coldburn.   They stopped at the Monmouth House.   Charlton Reading was not there.   She said: "I found the air disagreeing with me so much that I must change to the mountains.   I then sent for him, asking him if he could take me and he replied immediately that he could.   He came a day or two, possibly two or three days before we left, and arranged for our departure, and took us.   It was about the 1st of August that we left there.   We went first to the mountains southward,

and then as that disagreed, northward until we reached finally Canada. We passed through Washington and visited my uncle for half a day, the one who was then still living. From there we went to the St. Lawrence."

She was asked whether she went to a ball at Spring Lake with Mr. Reading, and she said: "I did. We went to the governor's ball and I took some friends of mine who were living at Spring Lake. The Rev. Doctor Willit's daughter was to meet me there and some other friends. An evening or two before we went, the young people thought they would enjoy going, so we went over to Sea Girt for a little while in the evening. The ball was held in the Beach Hotel at Sea Girt. The party was not dissolved until I was located the following fall for my winter quarters."

In the following fall her winter quarters were in New York city, in the Fifth Avenue Hotel, but she first visited Cornwall that fall. She was at Cornwall three or four weeks. She purchased a property there in February or March. "While in Cornwall the air seemed to suit me so well I concluded to look for a lot there. There was a lot that I liked very much, but I said, however, that I had no idea of taking any ground of any extent at all, that I was not able to look after it, being a woman alone, but the location was very desirable. Mr. Reading was looking at those lots with me, and he said, 'Oh, you won't have very much trouble with the ground; if you need advice of any kind I can give it to you.' My little daughter liked the location very much and I thought over it through the winter, and in the latter part of the winter concluded to buy it if I could. I found that I could buy it, and did so. I bought it in the early part of 1896. I commenced immediately with the architect concerning the plans. He had promised to hurry it for me. I think the ground was broken that spring and the foundations were slowly progressing through the summer of 1896. There were many difficulties. They began very soon. In September of 1896 my first difficulty was with the architect in the great delay of the contract being submitted to me. That delayed the foundation until late in the fall. Mr. Reading was in Cornwall about that time. That was in the latter part of 1896. He criticised some things about the foundation, but I paid no attention to his criticism. Some

time later I regretted that I had not listened sooner. He returned to Williamsport and had nothing to do with the construction of the house, as I remember, until the early part of 1897. Early in the summer of 1896 I visited my relatives in the west, Judge Reading's family, the aunt that I have alluded to before, and the rest of the family. I made the trip without Mr. Reading, some of my cousins there being kind enough to meet me at Chicago, cousins that live beyond Chicago. When I returned I found very great difficulty with my horses and coachman. There was a stable already upon the place that I was building, and I thought it just as well to have my own horses and coachman that summer, as I should be needing to go constantly back and forth between the Elmer House and the place that I was building, and I might as well, I thought, keep my own horses in the stable that I had there, and have them always at my command. So I bought horses without the aid of Mr. Reading in New York, the previous spring, and had arranged with a man at Cornwall who had lived upon this place with the family who lived there before I bought the place. I felt he was acquainted with the place. It was something I was entirely unaccustomed to, the charge of a country place. The coachman's report was terrifying in regard to the horses. In my dismay I sent for Mr. Reading. He came, and I told him that I felt that I had been cheated in the horses. I didn't know which way to turn about it, but I thought he could return them or have them returned in some way through the man from whom I purchased them. We tried to imagine that the horses were better, tried them some little time longer, but they were not. After that my health became very much run down at the Elmer House. I was obliged to leave for a little while. I sent for Mr. Reading to take the party to Lake Mohonk. Mr. Blood, my daughter's tutor, was to have joined us in the summer, but he was unable to do so, on account of having been poisoned by a poisonous vine. It was that fall that Mr. Reading criticised something about the foundation, and I paid no attention to it. In 1897 matters were showing themselves wrong. The foundation was not going as it should. I asked Mr. Reading to put his practical superintendence upon it. He came and took the superintendence of the house on a salary, as has been mentioned, of $50.00 and $100, with different arrangements as to paying his

board. That arrangement continued until he left. He super-intended it through the summer of 1897, and in the fall of 1897 the house was still in the midst of incompletion. I went to New York with my daughter for her education. Mr. Reading remained at Cornwall upon the construction of the house. I was in New York from December 1, 1897, and didn't go back to Cornwall until I was able to get into a part of the house on the 1st of the following June. During those six months from December, 1897, to June, 1898, Mr. Reading was at Cornwall superintending the building, and I was at New York, at the Fifth Avenue Hotel, with my daughter and maid, and the tutor visited there during the day to teach her. During the early part of that period I did not go to Cornwall so frequently, as I recollect it. Later I found it necessary to go oftener, as the decorators were at work. I generally found something wrong when I arrived. Mr. Reading lived during that time in Corn-wall at a boarding place that was rather less expensive than the Ehner House, across the street, a small boarding house. The name was Vogt. I stayed at Cornwall during those visits a few hours between trains, long enough to overlook the work, but not over night. I do not remember staying there at night at any time between December, 1897, and June, 1898. I think possibly my daughter and myself remained there a night, occu-pying the same room, one night before the house was finished. Q. When you went up to Cornwall to stay in June, 1898, where did you go? A. To my own house. The house was far from being completely finished. The work on the house and its be-longings and the work of improvement was going on. It was scarcely finished by the 1st of January, 1899. From the time we went up there to live in the house until the following winter the work that was going on was the finishing of the interior, painting, finishing the walls, furnishing, upholstery work, and outside work. There was trouble in getting electric light. Mr. Reading had charge of all the work of finishing up. There was also some grave question about an artesian well. Mr. Reading left there in December, 1898, I should think some time before Christmas. The work was scarcely finished; it had dragged very much. My confidence had been shaken in Mr. Reading, and I complained to him at times. At that time, in fact, a little before that, Mr. Reading had received his payment

from the sale of the Williamsport Gas Company, a commission he received from the sale. Q. Prior to that time you had been served with a writ in this case? A. Yes, sir."

Her attention was called to the two letters that Mr. Reading wrote to his wife and daughter, and she said she never knew anything of their contents until that moment, and never knew the letters had been written until after they had been received, and she heard through a member of the family that they had been written. She continued: " You asked me about my difficulties with Mr. Reading before he left. I should like to add that among other things, I found that he was not working for my interest. He was very much incensed, apparently, at a firm in New York who had been discovered by their own accounts to be defrauding me, but in their presence, when they came together, I found that he would not stand on my side, and yet he had the evidence in writing. That was one of my complaints."

Then her attention was called to the fact that it had been testified to that she had bought Mr. Reading a suit of clothes, and she said: " I never presented him with that suit of clothes. I had just paid him a bill—paid him for some services that he had rendered me. He remarked as he received the money or the check, that he would now get himself with it a suit of clothes that he had long been wanting. I think he said he had never had an afternoon suit; he never had any money left for his clothing; he would now have a suit that he wanted."

She was asked whether, at the last time she saw Mr. Reading, in December, 1898, or at any prior time, she had any idea he was going to leave his family, and she said, " Certainly not." Her attention was called to these letters that she had written, and she said that she was in the habit of writing, possibly using quotations in rather a flowery way at the time, and in a friendly way, to all her friends, ladies, cousins. " I would make little quotations from my favorite poets sometimes to fit in a little occasion." As a matter of fact, about that time she had just finished writing a volume of poems, and she said her pen was in that style.

On cross-examination she was asked whether she had not a number of first cousins, and her attention was directed to their names, the children of her father's brothers, and she admitted

that she had such cousins. She said that Charlton Reading " came to me just the day before I was obtaining my divorce, and before the decree was given. After that he came in two or three days and asked for his position. After that, I think, he was still in the city. He may have called again. He took my daughter, I believe, to Williamsport. Then he came to place the trust for me in the Fidelity. In the fall of 1892, Charlton Reading was assisting me in the equity suit. I was not preparing the suit in person, but I gave any assistance that the Fidelity Company asked, as far as I could. Mr. Charlton Reading came to my house and looked in my father's papers, and looked over different account books, and many details that I cannot recall now. This was the equity proceeding against Joseph M. Gazzam by the Fidelity Trust Company."

She was asked again as to the trip to the White Mountains, and she said : " Charlton Reading was sent for to be our escort. I sent for him to act as our escort. I think we were in the White Mountains about two weeks. We were away on the whole trip, I suppose, nearly a month, in getting there and in returning to New York, and to my father's old home in Flemington, where the old graveyard is. I asked Mr. Reading to take me there before sailing. I wished to see that that was taken care of before I sailed. He took me there for that purpose, with my child and maid."

She was asked whether, as a matter of fact, Mr. Reading took all his meals at the hotel while she was in Williamsport, and she said, " Certainly not; not that I am aware of. Q. Didn't he decorate your room with flowers daily ? A. No, sir; he did not decorate my rooms with flowers daily, but he had three or four pots of chrysanthemums in the room. I passed his house in the evening and his vestibule was decorated with very pretty pots of chrysanthemums, and when I reached my room I found a welcome there of three or four pots of chrysanthemums."

She was asked who went with her to the Hot Springs of North Carolina, and she replied, " Miss Colburn, my daughter, my maid, and Mr. Reading. We remained there until about September 1, 1895; went from there to Washington, where we remained a day or two. Mr. Reading was with us. Then we went to Alexandria Bay, on the St. Lawrence. Q. In going

to Alexandria Bay, on the St. Lawrence, you passed through Williamsport, in company with Mr. Reading, didn't you? A. I did. Q. You did not stop? A. The train stopped twenty minutes or more, I think, and Mr. Reading was looking for his son at the station. Q. What time of night was it? A. I don't remember; it was in the night. Q. What time did he join you in the beginning of 1896? A. That was the summer I sent for him on my arrival at Cornwall to take care of the horses for me. Q. That was the time you had difficulty about the horses and coachman? After you got through with the difficulty with the horses and coachman you went to Lake Minnewaska with him, didn't you? A. To Lake Mohonk. I didn't go to Lake Mohonk until later; he returned home. Q. He went home and then came back and took you to Lake Mohonk, didn't he? A. Yes, sir. Lake Mohonk is not very far from Lake Minnewaska, up in New York state. Q. What business had he remaining three weeks at Lake Mohonk after having taken you there? A. He was waiting to receive this contract from my architect. It was expected daily. Finding writing did little good, I began to telegraph to the architect, and at last it did not arrive until after Mr. Reading left. That detained him from day to day longer than he would have stayed. Q. Where did he go from Lake Mohonk? A. I suppose he returned to his home. He did not come back for me. My daughter's tutor joined us there, and he brought us down to Cornwall. That was in the fall of 1896. In the winter of 1896 and 1897 I went to New York, to the same hotel, the Fifth Avenue. During that time I suppose Mr. Reading was in Williamsport."

She said that the house was given over to an architect for his part. "I found that the architect was not carrying out his contract. I dismissed him, as I was obliged to do with some of the other contractors. I was obliged to have the other contractors supervised, as I found that they were not carrying out their agreements. For instance, when Mr. Reading came there, he had to have some change made in the foundation of the walls, and the drainage that they had agreed to put there, on examining the walls, he found it had not been put in, one very special and main drain from the house. In many matters of that kind, things needed supervision that it had not received from the different contractors. Q. Did you make a contract

with them that it should be done subject to the supervision of
Charlton Reading? A. Certainly not. I understood that it
was allowable to have a superintendent. At any rate, a super-
intendent was necessary, and they raised no objections. The
contractors raised no objections. Q. Did you present a gold
watch and chain to Charlton Reading? A. I did. Soon after
he first assisted me, attending to my trust matters, I saw that
Mr. Reading pulled out a watch that made me a little sorry to
think that a relative of mine of his age was not better fixed
than that, and I thought it better, rather than to offer my
cousin money, who had not been regularly under my employ,
to express my gratitude in that way. That was during, I think,
the first summer he came to me. Q. When was it you gave
him the diamond scarf pin? A. I did not give him what I would
call a diamond scarf pin. I think I gave him some kind of a
pin that had some small setting, I suppose. I do not recollect
when that was. That was some time later. It was just as I
have been accustomed to giving those things to my relatives
occasionally. Mr. Reading had told me, after my kindness to
him in obtaining this position and support for his family, that
I could call upon him as one of my nearest relatives of the
name to do anything for me where I needed a relative to do
for me, and I sent for him and paid his expenses. Of course,
I would not allow him, out of his salary, to pay the expenses
of a trip, but I never offered him money for that that I remem-
ber."

Verdict and judgment for plaintiff for $25,000. Defendant
appealed.

*Error assigned* was in submitting the case to the jury.

*Richard C. Dale* and *John G. Johnson*, for appellant.—Clear
evidence must be given of the enticement, of the wrongful and
malicious intent, to cause a man to desert his wife: Gernerd v.
Gernerd, 185 Pa. 233; Hutcheson v. Peck, 5 Johnson, 196;
Winsmore v. Greenbank, Willes's Reports, 577; Crocker v.
Crocker, 98 Fed. Repr. 702; Houghton v. Rice, 174 Mass. 366;
Bennett v. Bennett, 116 N. Y. 584; Price v. Price, 91 Iowa,
693; Jaynes v. Jaynes, 39 Hun, 40; Mehrhoff v. Mehrhoff, 26
Fed. Repr. 13; Westlake v. Westlake, 34 Ohio, 621; Baker v.

Baker, 16 Abbott's New Cases (N. Y.), 293; Warren v. Warren, 89 Mich. 123; Lockwood v. Lockwood, 67 Minn. 476; Duffies v. Duffies, 76 Wis. 374; Lynch v. Knight, 9 House of Lords, 577; Bradford v. Boley, 167 Pa. 506; Warner v. Miller, 17 Abbott's New Cases, 221; Churchill v. Lewis, 17 Abbott's New Cases, 226; Breiman v. Paasch, 7 Abbott's New Cases (N. Y.), 249; Foot v. Card, 58 Conn. 1; Doe v. Roe, 82 Maine, 503; Haynes v. Nowlin, 129 Ind. 581; Clow v. Chapman, 125 Mo. 101; Kroessin v. Keller, 60 Minn. 372.

*Henry C. McCormick* and *Ellis Ames Ballard*, with them *Seth T. McCormick*, for appellee.—The case of Gernerd v. Gernerd, 185 Pa. 233, expressly decides that a wife may maintain an action in her own name, against one who has wrongfully enticed her husband to leave her.

In Warren v. Warren, 89 Mich. 123, it is held that a wife is entitled to the society, protection and support of her husband as certainly under the law, and by moral right, as he is to her society and services in his household: Matheis v. Mazet, 164 Pa. 580; McAlmont v. McClelland, 14 S. & R. 361; Cornelius v. Hambay, 150 Pa. 359.

*Richard C. Dale* and *John G. Johnson*, for appellant in reply.—The basis of an action, brought by one woman against another, to recover damages for alienating the affections of the plaintiff's husband and inducing him to abandon her, is the loss of consortium and not the mere loss of assistance; and the plaintiff cannot succeed unless she shows that the defendant was the active inducing cause of the abandonment, and that such abandonment did not result solely from the wishes of the husband. The fact that the defendant was attractive and submissive is not sufficient: Buchanan v. Foster, 23 App. Div. N. Y. Supreme Ct. 542; Whitman v. Egbert, 27 App. Div. N. Y. Supreme Ct. 374; Eldredge v. Eldredge, 79 Hun (N. Y.), 511.

OPINION BY MR JUSTICE BROWN, July 17, 1901:

If there was evidence in this case to sustain the appellee's complaint that the appellant had taken from her the society and affection of her husband, and, by causing him to abandon

her, had deprived her of the support due her as his wife, the judgment before us cannot be disturbed. This seems to be conceded by the learned counsel representing the appellant, who take no exception to what the court below said to the jury as to the law in a proceeding like this, and assign as the single error appearing on the record the refusal to affirm the only point submitted, that "Under all the evidence in this case the verdict should be for the defendant."

The case was most carefully tried. Not an exception by the defendant appears to the admission or rejection of evidence, and neither plaintiff nor defendant complained of the general charge, in which the learned trial judge correctly spoke these words to the jury: "An action of this kind can be maintained, provided the facts as alleged by the plaintiff are clearly proven. The wife is entitled, as a matter of right, not only to the support and maintenance of her husband, but also to his love and affection. It follows that if any woman by the exercise of any arts or wiles, alienates the husband's affections from his wife, entices him away from her presence, so that she has not the consolation and advantage of his society and does not receive adequate support from him, an action may be maintained for such an injury. To entice away or corrupt the mind of one's consort is a civil wrong for which the offender is liable to the injured wife. The gist of the action is not the loss of assistance, but the loss of consortium of the husband, under which terms are usually included the person's affection, society and aid. The plaintiff's allegation is a very serious one, and it is incumbent upon her to prove to you, before any recovery can be had, that the defendant, Mrs. Gazzam, enticed her husband away, that she did something by which his former affections were alienated, by which he afterwards failed to perform those duties which the husband always owes to his wife, for support and the like. I charge you that there can be no recovery by the plaintiff unless you find from the testimony that the defendant intentionally and wickedly alienated the affections of Charlton Reading from his wife, intentionally enticed him away from her presence, and thus induced him to withhold the love and affection which he by law owed to her." Our duty has, therefore, been simply to review with care the evidence produced by the plaintiff, to determine whether the court below should

have said to her that, with all her proofs, she could not recover. We have so reviewed it, and are compelled to the conclusion that, under the law conceded to have been correctly spoken by the learned trial judge in his instructions to the jury, it was for them to say whether, on the case as presented by the plaintiff, she ought to recover for the wrong of which she complained. It is not for us to say that, if we had been the jurors, our finding might have been for the plaintiff or that our verdict would have been for the defendant; we are only to determine whether the plaintiff brought to the support of her serious accusation such proofs as would justify a jury, properly instructed by the court, in returning a verdict in her favor. Having determined that there was such evidence for their consideration, we might well affirm the judgment without saying more, and will refer but briefly to some of plaintiff's proofs in illustration of the necessity which was upon the court below to submit this controversy to the jury for their just disposition of it.

The following extracts from some of the defendant's letters to the husband of plaintiff, written during the period of her alleged enticement of him, can hardly be regarded as legitimate portions of strictly business communications, but, even "from a fifth cousin once removed," rather impress the impartial mind as wooing words from one woman to the husband of another; and the court would have erred if it had said to the jury that they were not, in connection with all the other evidence in the case, to be fairly regarded as proofs of the allegation that the defendant intended to entice the husband from his wife:

"My dear Cousin: I was beginning to be worried about you before your letter came, telling me that you are comfortably settled, of which I am very glad,—though your closing word is one of the saddest—my own heart can respond to the truth of that. Yet were Mr. Gazzam here, as in years past, I would be a more lonely woman than I am to-night—freedom is blest—sometimes —and yet!

"You have my sympathy, but it will not relieve your loneliness however earnestly I wish it might—yet, from my own experience trouble is lighter with a friend at one's side. . . . Write to me dear cousin whatever you care to say—I shall keep the confidence of your letters. . . . Aug. 5, 1892.   How

much I would like to have you here just now—'to comfort me,' but the conventionalities, which you justly recognized when here, I foresee must deprive me largely of even my cousin. Yet they cannot altogether—in fact I find myself looking to see you soon again.   And now, good-night—'a thousand times good-night,' to coax away the solitude.

"Affectionately your cousin, Anne."

"My dear Cousin: I am writing you before breakfast because having recd. your letter I am so tired with the mail that failed to deliver my letter to you on Sunday, as I intended it should, and sent it on Saturday for that purpose.   Sunday is such a long lonely day and on your first Sunday 'alone' my thought was with you.   Perhaps in the Beyond, without the 'touch of a button' we can present ourselves where we will.   Instinctively my spirit sought yours at your window on Sunday, but I forgot to raise my eyes to the mountain whose lights I used to watch from my window on Sunday afternoon—You are brave and you will yet have much of the joys of living that belong to this present sphere. . . .

"Affectionately your cousin, Anne."

". . . . My dear Cousin, I fear you will feel that I am not worthy to put one brick in a church. . . . I am leaving to the last page my impatience for your coming.  'Some things are ill to wait,' says Jean Ingelow, and I am spoiled and lonely for a talk with you. . . . Tell me at what hour you will be due in Philadelphia and whether I may expect you to supper. Wednesday evening—And now until Wednesday, good-by—and when you look at the silver bow over the mountain do not believe that you are 'alone.'

"Your affectionate cousin, Anne."

"My dear Cousin: Your delightful letters have been received but I am disappointed that I will not see you at Xmas.

"I am glad—so glad—that you can write more cheerfully now—I regret so much to hear what you say about no welcome in one place on Xmas.   At least you must know there is one other place where you would find a cordial welcome.   I cannot understand,—as you left here early on 'the last afternoon' to go to the fair—and I thought all was serene and happy—Bessie

was over one afternoon sometime ago to play with Antionette and she expects to go over this afternoon to play with Bessie if she finds her at home.

"I have just had a beautiful letter from a friend in New York, who signs himself, for the first time, 'Hamlin.'—The name is pretty—He writes me to visit him at his office—What do you think of women calling at men's offices—do you approve? I inclose Mr. Pigott's last—I have replied that Mrs. Jamieson was my father's nurse, and for address, &c., have referred him to Dr. Bell.

"Believe me your affectionate cousin, Anne."

"My dear Cousin: Your delightful letter received a day or two ago was next best to seeing yourself. I have for some time been ill in bed, and I had been lying here thinking how a letter from you would brighten this dark corner of the room and at last 'my ship came in' and I have your message of remembrance by me. What a fraud you are anyway, but it is unnecessary to believe in all your little wiles to make them pretty and interesting. You and I don't live altogether by faith. You know we are aware we can live, at least in a way, whether we believe or not.

"When the boat passed just beyond the line of recognition, I hurried to the other end of the deck, and waved and waved the roses, hoping to catch one more returning signal from you, but I could no longer distinguish among the throng. . . . About 5 o'clock in the afternoon I often picture you as walking up in the midst of a sunny autumn noon to a delicious mittagessen of chicken, with a good American flavor, and all the blessings of a Pennsylvania fall, peaches, melons, egg plant, lima beans, corn fritters, sweet potatoes, &c., &c. This is a pleasant picture to me. . . . I am anxious to hear about yourself. How I wish I could know you have passed the worst and are recovering. It hurts me to think what you must suffer. . . . You will remember your promise I am sure, of letting your nurse send me a line if you are unable at the first to write me how you are, and do not attempt such a thing yourself until you are fully able. . . . I find that those little mistakes of the Doctor's in New York were not so much mistakes, but birth marks so to speak. He must have been born a few minutes

late by the clock. . . . My heart was divorced long before the law 'set me free from that dead body,' to use Mr. G. Jenkins' language. . . . I shall watch the mails whenever a letter is due from you, and I shall often live over in spirit some of the pleasant hours you gave me last summer. Believe me, loving and faithfully,

" Your cousin, Anne."

In addition to the foregoing, one witness testified that, having come unexpectedly upon the defendant and Reading in a hotel at Williamsport, she found them " sitting on a very small lounge, and he had his arm around her, and she was leaning on him ; " and others relate how Mrs. Gazzam and Reading spent months at a resort at Cornwall-on-the-Hudson ; how he was constantly in her bedroom ; that they were driving together, and strolled alone at night through the dark lawn until late hours, at times not returning to the hotel until twelve or one o'clock. The intention of the defendant may not have been to woo Reading from his wife and win him for herself ; but the court could not have so declared, in the light of the evidence produced by the plaintiff, to some portions of which we have just called attention. It was a question of fact to be determined by a jury, under all the evidence before them—plaintiff's proofs, as well as the defendant's with her denials and explanations.

There was evidence that after Reading began to spend his time with Mrs. Gazzam, his love and affection for his wife waned, and he became indifferent to her support. Finally, there was absolute abandonment, the conclusive evidence of the wife's loss of her husband's love and affection; and that this abandonment was not complete until after the institution of this suit cannot affect the plaintiff's right to recover for the alleged wrongs committed before, but can rather be justly regarded as the consummation of what the defendant intended to do and partially succeeded in accomplishing before she was sued.

If the jury found, as they did, that it was the intention of the defendant to alienate the affections of Charlton Reading from his wife, and to entice him away from her, they were justified in finding that she had succeeded ; and we cannot interfere with their finding. It may be that the defendant is guiltless of what she has been convicted. No single letter written by her

and no one act testified to as having been done by her would be sufficient to support the grave accusation against her; but all that she did and all that she wrote, taken together, present such a case that a jury alone could pass upon the question of her guilt. The court could do nothing for her but give her what she has received, a fair and proper trial; and she cannot justly complain that what she may now look back upon as her folly was fairly regarded by a jury as her serious conduct for the accomplishment of a great wrong, the penalty for which is found in their verdict.

Judgment affirmed.

MITCHELL, FELL and POTTER, JJ., dissent.